UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

LAS UVAS VALLEY DAIRIES,                           Case No. 17-12356-t11

      Debtor.

## <u>OPINION</u>

This contested matter involves New Mexico personal property taxes on the debtor's dairy herd. Doña Ana County, which assessed and is now trying to collect the taxes, did not include the prepetition livestock taxes in the proof of claim it filed in this case, nor did it give the liquidating trustee timely notice of its administrative expense claim for postpetition livestock taxes.

The Court was required to decide whether the County could collect the taxes even though the pre- and postpetition bar dates had passed. In an unusual and telling procedural move, the parties submitted both matters to the Court on minimal stipulated facts. At the parties' request, the Court did not hold an evidentiary hearing.

The County's legal arguments changed over time, but it never argued that its due process rights would be violated if the Court enforced the administrative expense bar date in the liquidating plan confirmed in the case. And, although the County initially relied heavily on a Bankruptcy Rule[1] 9006(b)(1) "excusable neglect" argument for permission to file a late claim for prepetition livestock taxes, by the time of the final, non-evidentiary hearing, the County had abandoned the argument.

Based on the stipulated facts, the Court ruled that the 2017 livestock taxes were a prepetition claim; that the County could not amend its proof of claim to add 2017 livestock taxes;

---

[1] All references to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

that to the extent the "excusable neglect" issue was still before the Court, the County had not

carried its burden of showing excusable neglect; and that the administrative claim bar date applied

to the County and prevented it from getting paid on its administrative expense claim.

The County appealed to the District Court. Consistent with the positions it took before the

Court, the County did not make a due process argument on appeal. Furthermore, the County's

appeal did not focus on excusable neglect, but on its arguments that the 2017 livestock taxes were

a postpetition obligation or, alternatively, that the County should be allowed to amend its proof of

claim. To the extent the County mentioned excusable neglect on appeal, it did not confine itself to

the stipulated facts, but instead relied heavily on an alleged "reason" that was never brought before

the Court and is contrary to the record.

The District Court affirmed the Court's ruling in part but reversed and remanded on three

issues:

> [1] The Court remands this matter to the Bankruptcy Court so that it may revisit
> whether to allow Doña Ana County to file its claim for [the 2017 livestock] taxes
> out of time based on excusable neglect, in light of the reasons Doña Ana County
> provided for its failure to act in a timely manner;
>
> [2] In doing so, the Bankruptcy Court should also address the parties' factual
> dispute regarding whether the personal property taxes included in Doña Ana
> County's timely Proof of Claim were for livestock;
>
> [3] [the District Court] reverses the Bankruptcy Court's Opinion and Order to the
> extent the Bankruptcy Court rejected Doña Ana County's administrative claim for
> the 2018 Livestock Taxes as untimely, and remands this matter to the Bankruptcy
> Court for it to consider whether there is any basis other than the Administrative
> Claims Bar Date on which to reject this claim; if there is no other basis, the claim
> should be allowed.[2]

---

[2] District Court Opinion, pp. 37-38. The District Court held that enforcing the administrative
expense bar date in the confirmed liquidating plan would violate the County's due process rights.

The Court held an evidentiary hearing on the remanded issues on October 5, 2023. The County and Robert Marcus, the liquidating trustee, called witnesses, introduced documentary evidence, and made opening and closing arguments about the three remanded matters.

The Court now finds and concludes that the County's proof of claim did not include any livestock taxes. While the County attempted, ex post facto, to show that 2016 livestock taxes were included in the proof of claim, plainly they were not. This attempt convinced Marcus to pay taxes he did not have to pay.

Second, the Court finds and concludes that the "provided reasons" cited by the District and Magistrate Courts give no additional support to the stipulated facts for an excusable neglect finding. All but one of the "provided reasons" is unsupported, several are irrelevant, and two are based on misrepresentations of the record. Alternatively, if the District Court wanted the Court to reopen the evidence on the excusable neglect issue, the evidence obtained at the remand hearing, when combined with previously stipulated facts, does not support a finding of excusable neglect.

Finally, the Court concludes that the County's administrative expense claim must be allowed, as enforcement of the confirmed plan's administrative expense bar date was the only reason for disallowance. The Court notes, however, that the due process concerns identified by the Magistrate and District Courts as preventing enforcement of the administrative expense bar date were not argued before this Court or on appeal.

A.    Facts and Procedural History.[3]

The Court finds, based on the Stipulated Facts (defined below) and the evidentiary record made at the remand hearing:[4]

The County and its efforts to collect the Debtor's property taxes. Las Uvas Valley Dairies ("Debtor") operated a large dairy in Doña Ana County, New Mexico. For years, Debtor had paid substantial property taxes to the County on its real estate and dairy herd. It filed this chapter 11 case on September 15, 2017.

The County collects about $150 million per year in property taxes. Eric Rodriguez, the County Treasurer, is in charge of collecting all taxes and other funds due to the County. He was elected to the position in November 2016. Before the election, Rodriguez served for one year as the Chief Deputy Treasurer for the County.

Terri Barraza started working for the Treasurer's office of the County in 2006. Since 2009, she has been the Cash Operations Supervisor for the office. In that role, she supervises at least six employees. Her job duties include dealing with bankruptcy cases filed by debtors that owe taxes to the County.

Before the case was filed, Barraza created a list of her duties as the Cash Operations Supervisor. Under the heading "Bankruptcies" she wrote:

> a)  Research properties owned and calculate taxes due at time of filing, must include current year taxes owed as of January 1st. (Estimated taxes due per Assessor's side);

---

[3] Some findings of fact are in the discussion portion of the opinion and are incorporated by this reference.

[4] The Court also takes judicial notice of its docket in this case and of the docket on appeal. *See Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010) ("We take judicial notice of court records in the underlying proceedings."); *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) ("[W]e may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand.").

b) Prepare Proof of Claim, have it signed and mailed to Bankruptcy
Court;
c) Flag account BKRT Chapter and effective date, scan proof of claim.

Neither Rodriguez nor Barraza had any training in bankruptcy law or procedure. However, they had access to two County attorneys, upon whom they could have called for assistance if needed.

In May 2016 the County began transitioning its tax records to a new software system. The new system was purchased by the Assessor's office, which, according to Barraza, got a lot more training on the system than the Treasurer's office.

The County received written notice of the Debtor's bankruptcy case filing on or about September 19, 2017. The notice did not include a "bar date" for filing proofs of claim. Nevertheless, Barraza promptly began work on a proof of claim. She also suspended billing and collection activity on Debtor's real and personal property tax accounts.

To draft the proof of claim, Barraza printed statements of the Debtor's 2016 and 2017 real property taxes, attached them to the claim form, and used the sum ($234,816.03) as the claim amount. Her practice had always been to file proofs of claim as secured by real property, and that is what she did. At the time, Barraza did not know the difference between a secured and an unsecured claim.

Barraza completed the proof of claim on October 5, 2017. She took the completed form to Rodriguez for review and signature. Rodriguez reviewed the claim and signed it but did not verify that all prepetition taxes were included. Through an oversight, Barraza did not include any livestock taxes. When asked if she knew why she did not include those taxes in the proof of claim, she replied "no." Barraza did not blame the new software system for the failure, nor did she say

that the 2017 livestock taxes were not included because she thought they were a postpetition administrative expense.

The County filed its secured proof of claim for $234,816.03 on October 18, 2017. "Real Property" was the stated basis for the claim (section 2). In Section 4, the County stated that its collateral was real estate. In Section 5, the County asserted a § 507(a)[5] claim for taxes or penalties owed to governmental units. Attached to the proof of claim are 14 property tax statements. Each statement has a separate real estate parcel number and legal description. The County redacted the account numbers on the statements. Thirteen of the statements are for real property while one is for "mobile home improvement property." None are for livestock.

Each year the County proceeds according to statute and practice to assess, bill, and collect taxes on taxable real and personal property in the county. By October 1 of each year, the County has identified the taxpayer for all livestock in the county; fixed tax rates; and prepared property tax schedules. By November 1 of each year the County has finalized the property tax bills for the year. Thus, when Barraza prepared the proof of claim, she had enough information to include the 2017 taxes, while within two weeks of filing the proof of claim, she had the final tax bills for 2017. The 2017 real property taxes are part of the proof of claim ($150,793.80 of the total claim amount), proving beyond question that the County was able to include 2017 taxes. The failure to include livestock taxes was not due to the unavailability of final tax information.

The Court entered a bar date order on November 15, 2017. On November 17, 2017, Debtor's counsel mailed to all creditors a notice of the bar date. Barraza got two copies of the bar date notice shortly thereafter. The bar date for governmental units like the County was March 14,

---

[5] All statutory references are to 11 U.S.C. unless otherwise indicated.

2018, more than four and a half months after the County filed its claim. Barraza testified that she did not feel the need to take any action in response to the bar date notice.

After it filed its proof of claim, the only action taken by the County in the bankruptcy case was to create a paper file for the case. Into the file Barraza placed all documents she received related to the case. These included the bar date notice, all proposed plans of reorganization or liquidation, all proposed disclosure statements, and notices of deadlines to object to the plans. Neither she, Rodriguez, any County attorney, nor any other County employee read or understood any of the documents other than the notice of case filing and the bar date notice.

The Liquidating Plan. Debtor was not able to reorganize. In May 2018, the unsecured creditors committee and Debtor's two largest secured creditors, Production Credit Association of Southern New Mexico ("PCA") and Metropolitan Life Insurance Company ("Met Life"), filed a plan of liquidation (the "Plan"). The Plan provided for the creation of a liquidating trust and the appointment of a liquidating trustee, whose job it would be to sell Debtor's assets and distribute the net proceeds to creditors.

Paragraph 5.1 of the Plan provides:

> Time for Filing Administrative Claims. The Holder of an Administrative Claim, other than (1) a Professional Fee Claim, (2) a liability incurred and paid in the ordinary course of business of the Debtor including that for moneys used pursuant to the Cash Collateral Orders, or (3) an Allowed Administrative Claim, must file with the Bankruptcy, notice of such Administrative Claim within ninety (90) days after the Effective Date. . . . Failure to file this notice timely and properly shall result in the Administrative Claim being forever barred and discharged.[6]

---

[6] Every plan filed in this case, i.e., the joint UCC/Debtor plan; the Met Life plan; the UCC plan; the Debtor plan; the amended Met Life plan; the amended joint UCC/Debtor plan; the amended Debtor plan; the joint Met Life/PCA plan; and the Plan, all had administrative expense bar dates that include postpetition taxes. It is the rule, not the exception, to insert such bar dates into chapter 11 plans, especially liquidating plans.

The disclosure statement that accompanied the Plan (the "Disclosure Statement") also states that administrative expenses will be allowed only if a notice has been timely filed.

A review of the Plan and Disclosure Statement makes clear that the plan proponents did not know about the County's claim for livestock taxes.[7] The Plan classified the County's prepetition claim as a class 5 secured claim, collateralized by real property.[8] The Disclosure Statement includes an estimate of unsecured priority tax claims of only $33,587.03. The listing of approved administrative expense claims, an exhibit to the Disclosure Statement, does not include the County.

Had the County exercised ordinary diligence in reviewing the Plan and Disclosure Statement, it would have realized that its claim for livestock taxes was not known to the Plan proponents and had not been provided for in the Plan. The County would also have seen that it was required to file a notice of its administrative tax claim.

Barraza or Rodriguez should have asked one of the county attorneys for assistance in the case. Thus, not only did they make serious errors by filing a proof of claim that did not include livestock taxes and by ignoring the Plan and Disclosure Statement, they compounded their mistakes by failing to refer this large, complicated matter to one of the available county attorneys, who could have entered an appearance and protected the County's interests.

The Court finds that the County was lulled into complacency because Barraza's previous bankruptcy cases all involved real property taxes, which are secured by a "priming" first lien on real estate. In such cases, the County will always get paid in full eventually. Filing a proof of claim

---

[7] Debtor filed schedules on October 4, 2017. Debtor's Schedule D listed the County as a secured creditor, with a "Tax Lien on all property in Doña Ana," securing a debt of $216,975.10. The County's tax lien only encumbered real property. The County is not listed in Debtor's Schedule E/F as an unsecured creditor.

[8] In contrast, the County's claim for livestock taxes is an unsecured priority claim.

is not even necessary to protect the County's favored position. This case was Barraza's first where the County had a large unsecured claim. Her failure to appreciate the difference between a priming first lien secured claim and an unsecured claim was a significant cause of the County's problems now before the Court.

The Court confirmed the Plan on June 14, 2018. The confirmation order modified the Plan in a number of respects. Significantly, it reduced the time for filing administrative expense notices from 90 to 15 days after the Effective Date of the Plan. The confirmation order also changed the Effective Date to the confirmation date, rather than three business days after the confirmation date.

The Plan proponents did not serve the County with a copy of the confirmation order. They should have done so. Further, the Clerk's office did not mail notice of Plan confirmation to the County, as required by Bankruptcy Rule 2002(f)(7).

On or about July 10, 2018, the County received a notice of deadline for filing objections to the liquidating trustee's motion for entry of final decree. The notice enclosed a copy of the motion, which states that the Plan was confirmed on June 14, 2018.

Liquidation of the bankruptcy estate. In the summer of 2018, Robert Marcus, the successor liquidating trustee, sold Debtor's dairy herd for approximately $9 million and distributed the net proceeds to the two main secured creditors, Met Life (owed about $28 million) and PCA (owed about $17 million).

In January 2019 Marcus filed with the County a 2019 New Mexico Livestock Report, in which he reported that the liquidating trust owned no livestock.

At some time in early 2019, someone from the County, possibly Barraza, spoke to Marcus on the telephone about 2016 real property taxes due for three specific tax accounts. Marcus did not

know about the tax accounts but in general terms disputed the liquidating trust's liability for any taxes that were not part of a filed proof of claim. Livestock taxes were not discussed.

Marcus sold Debtor's real estate in March 2019. From the sales proceeds Marcus paid the County $339,611.59 on March 22, 2019, much more than the proof of claim amount. The payment paid all 2016-2019 real property taxes. The "unclaimed" 2018-19 real property taxes were paid because they were secured under New Mexico law by a first lien on the real property Marcus sold. To deliver clear title to the buyer, the taxes had to be paid. As a consequence, the dispute over the County's administrative expense claim was reduced.

By the end of March 2019, all estate property had been sold, all real property taxes had been paid, and the liquidating trust was no longer accruing taxes by owning taxable real or personal property.

The unpaid livestock taxes. On March 25, 2019, the County sent Marcus an email that "the only balance left for Las Uvas Valley Dairies is Personal Property Account #P001767 for cattle." She referred Marcus to an "attached spreadsheet." In fact, there are three spreadsheets attached, each with different figures. All three show unpaid livestock taxes for 2016, 2017, and 2018, totaling $438,453.01.

Of particular interest is that the first column of each spreadsheet purports to reflect the accounts that comprise the County's proof of claim. But, while the proof of claim only included 14 accounts, the spreadsheets include between 37 and 40 accounts—34 to 37 accounts for real property, 2 for mobile homes, and 1 for livestock. The first and third spreadsheets include livestock taxes of $8,877.22 in the first column, while the second spreadsheet shows 2016 livestock taxes of $147,012.03! To get the numbers to add up to the proof of claim, Barraza reduced various real

property taxes by a like amount.[9] The spreadsheets reflect an improper attempt by the County to "shoehorn" the 2016 livestock taxes into the filed proof of claim.

Although he did not respond to the email, Marcus disagreed that the estate was liable for the livestock taxes, as no claim or notice had been filed.

The settlement with Met Life. After the real estate was sold, Marcus negotiated with Met Life to settle a number of issues. His negotiating position was based on the claims filed in the case. His goal was to obtain a good dividend to general unsecured creditors.

On May 3, 2019, Marcus filed a motion to approve a settlement with Met Life. Under the deal, Met Life agreed to accept $7,840,081, leaving an unsecured claim of $6,481,297. The settlement was approved on July 24, 2019. Had the County timely filed its claims for livestock taxes, Marcus would have obtained an additional $468,153.32 for the liquidating estate in his settlement with Met Life. The County argues that when he negotiated with Met Life, Marcus was on notice of the County's asserted claim for livestock taxes. That is true. However, Marcus testified, and the Court finds credible, that he did not think he had to take those tax claims into account because no proofs of claim or notices of administrative expense had been filed for the taxes.

Marcus objects to the County's proof of claim. On November 22, 2019, Marcus filed a partial objection to the County's proof of claim, asserting that the claim had been paid except for $8,877.22.[10] Marcus asked the Court to declare that the estate owed the County $8,877.22 or less. The County responded on December 23, 2019, asserting that it was still owed $471,816.85. The

---

[9] For example, in her first spreadsheet, Barraza reduced the account R1201947 balance from $127,577.76 to $118,091.23.

[10] This amount was given to Marcus by the County as the unpaid balance on the proof of claim. As discussed elsewhere, there was no unpaid balance.

County asked for an enlargement of time to file and/or amend its proof of claim and apply for allowance of its administrative expense under the "excusable neglect" standard of Bankruptcy Rule 9006(b)(1). In support of this request, the County argued that the "*Pioneer*"[11] factors weighed in favor of allowing the late-filed claim and administrative expense. The County also argued:

- Personal property taxes are a priority lien;
- "[T]he sale of Debtor's real and/or personal property, subsequent disbursements from proceeds, and the method in which the bankruptcy was administered does not prevent taxes from continuing to accrue against Debtor's real or personal property and that said taxed are due and owing. The property taxes do not just go away.";
- The Debtor was aware of the 2017 and 2018 taxes. The Debtor has continued to receive tax bills;
- Personal property taxes assessed postpetition may be pursued in the usual fashion;
- There was no prejudice to the late filing of an administrative expense claim;
- The County has no record of receiving the Debtor's and UCC's joint plan or the order confirming the Plan;
- The proof of claim was filed by a layperson, who could not be expected to know about the deadline for filing an administrative expense claim; and
- The fact that the County did not know its claim was defective is evidence that it may not have received some of the bankruptcy documents.

After a preliminary hearing on the claim objection, the County filed an amended response to the objection on February 24, 2020. In the amended response, the County listed a number of annual calendar dates of significance for taxing property in Doña Ana County. It then argued:

- Because the 2017 tax liability had not been determined on the petition date, the proof of claim only included 2016 taxes;
- It has an unpaid $8,877.22 prepetition claim;
- It has a $464,377.22 a postpetition administrative expense, which should be paid pursuant to § 503(b)(1)(B); and
- If the Court finds that some of the $464,377.22 is a prepetition claim, the County should be allowed to amend its proof of claim under the "excusable neglect" standard.

The County moved for summary judgment in the contested matter on March 30, 2020, arguing:

- The 2017 taxes were a postpetition administrative expense;

---

[11] *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395 (1993).

- Section 503(b)(1)(B) and other statutory and case law obligate Marcus to pay the administrative expense claim;
- In the alternative, the County should be allowed to amend its proof of claim to include 2017 taxes because "good cause and excusable neglect exist"; and
- In the alternative, the Court should pro-rate the 2017 taxes between pre- and post-petition taxes.

Marcus filed a cross-motion for summary judgment on April 16, 2020. He argued:

- The 2017 taxes are a prepetition claim and cannot be claimed because the bar date has passed;
- The County should not be allowed to amend its proof of claim;
- The County should not be allowed to file a late claim under the excusable neglect standard; and
- The County's administrative expense claim is barred by the bar date in the Plan.

The Court was dissatisfied with the procedural posture of the dispute, given that Marcus was objecting to claims the County had not filed, while the County was seeking relief without filing a motion. The Court gave a deadline for the County to file a motion to amend its proof of claim and/or an application for allowance of an administrative expense. The County timely did so, filing the motion on June 12, 2020 (the "Motion to Amend and Application to Pay"). The County argued in the Motion to Amend and Application to Pay:

- $8,877.22 of the County's proof of claim is for 2016 livestock taxes;
- The 2017 and 2018 livestock taxes are postpetition administrative expenses;
- The Plan clearly and unambiguously requires Marcus to pay the administrative expenses;
- If the Court rules that the 2017 taxes accrued prepetition, the Court should allow the County to amend its claim under principles of equity;
- The County admits receiving the Plan and Disclosure Statement and the notice of deadline to object to the Plan, but not the confirmation order; and
- The County incorporates by reference its previous arguments.

Neither Bankruptcy Rule 9006(b)(1) nor "excusable neglect" was mentioned, nor were the *Pioneer* factors argued.

Marcus responded on July 1, 2020, arguing:

- The County is bound by the Plan, which unambiguously required the County to file a notice of administrative expense claim by the stated deadline;

- The 2017 taxes are prepetition;
- The County cannot amend its proof of claim; and
- The County abandoned its excusable neglect argument. Alternatively, the County had not shown entitlement to relief under the excusable neglect standard.

The County replied on July 15, 2020. The only new argument asserted in the reply was that the confirmation order was not a final order and, therefore, had no res judicata effect. It did not dispute Marcus' assertion that the County had abandoned the "excusable neglect" argument.

7. <u>Submission of the Motion to Amend and Application to Pay on stipulated facts</u>. The Court held a hearing in the contested matter on August 6, 2020. At the hearing, the parties stipulated to certain facts (the "Stipulated Facts").[12] They asked the Court to rule on the Motion to Amend and Application to Pay based on the Stipulated Facts, without an evidentiary hearing.[13] Thus, the hearing turned into oral argument on the merits, based on the Stipulated Facts. The cross-motions for summary judgment were superseded by the Motion to Amend and Application to Pay, the Stipulated Facts, and the arguments made at the final, non-evidentiary hearing. The County made the following arguments at the hearing:

- The 2017 taxes are postpetition taxes;
- The Plan and associated documents combine to place the affirmative duty on the trustee to pay the postpetition taxes;
- *Espinosa*[14] does not apply because the Plan required Marcus to pay the claim;
- Because § 503(b)(1)(B) does not require the County to file an application for administrative expense, Marcus had a due diligence obligation. Had he complied with it, he would have discovered the estate's obligation to pay postpetition personal property taxes; and

_____

[12] The Stipulated Facts were: (1) the factual statements (not the opinions) in Marcus' declaration, attached to his brief in opposition to the County's motion for summary judgment, doc. 581, filed April 16, 2020, pp 21-24; (2) the averments in Barraza's affidavit, attached to the County's reply brief in support of summary judgment, doc. 582-1, filed April 30, 2020; (3) any admissions in the summary judgment motion response, and reply, doc. 578, filed March 27, 2020; doc. 579, filed March 30, 2020; and doc. 580, filed April 16, 2020; and (4) the County's admission in the Motion to Amend and Application to Pay about the bankruptcy documents it received. The parties tried to agree about the years and types of taxes in the County's proof of claim but were not able to do so.
[13] Transcript of August 6, 2020, hearing, pp. 12 and 13.
[14] *United States Aid Funds, Inc. v. Espinosa,* 559 U.S. 260 (2010).

Case 17-12356-t11    Doc 719    Filed 12/01/23    Entered 12/01/23 14:19:44 Page 14 of 38

- The County and other governmental units would be prejudiced if the administrative expense claim was not paid.

Consistent with the Motion to Amend and Application to Pay, the County did not argue for an enlargement of time under Bankruptcy Rule 9006(b)(1)'s "excusable neglect" standard.[15]

In response, Marcus argued:

- The 2017 taxes accrued prepetition and are not an administrative expense;
- The plan clearly required the County to file a notice of administrative expense within the deadline before it could be paid; and
- Allowing the County's administrative expense claim would prejudice general unsecured creditors.

At no point in the litigation did the County raise due process as a defense to Marcus' argument that the County was time-barred from filing an administrative expense claim. Quite the contrary—the County argued that "there are provisions throughout the plan, the trustee's agreement, and the order adopting the plan that provide for the relief that Doña Ana County is entitled to."[16] In all of the motions, objections, briefs, and transcripts, due process is never asserted as a claim or defense.

Based on the Stipulated Facts, the Court ruled on September 18, 2020, that (1) the 2017 taxes were a prepetition claim; (2) the County did not carry its burden of proving entitlement to amend its proof of claim to include the livestock taxes; (3) the County did not carry its burden of proving entitlement to an enlargement of the claim deadline by showing excusable neglect; and (4) the County's administrative expense claim for the 2018 livestock taxes could not be allowed because it was asserted long after the bar date in the confirmed Plan.

---

[15] At the hearing, the County's attorney acknowledged that its "positions and argument on this have evolved over the last three or four months as I've looked at it from difference angles and – and also developed some of the case law." Transcript of August 6, 2020, hearing, pp. 4 and 5.

[16] Transcript of August 6, 2020, hearing, pp. 10.

The County's appeal to District Court. The County timely appealed the Court's ruling to the District Court, listing 15 issues to be presented on appeal. None of 15 issues asserted a violation of due process, nor was Bankruptcy Rule 9006(b)(1) or "excusable neglect" mentioned. Similarly, the County's briefs are silent on the due process issue.[17] The County's opening brief refers to "excusable neglect" in a single paragraph contained in its "right to amend" section of the brief. The County's reply brief argues "excusable neglect" more fully, relying primarily on alleged facts that were not part of the Stipulated Facts and are contrary to the record.

On September 30, 2021, the District Court (1) affirmed that the 2017 Livestock Taxes were incurred pre-petition; (2) affirmed that the claim for 2017 Livestock Taxes is a new claim that cannot be added by amending the existing proof of claim; (3) found that this Court failed to consider certain "provided reasons" relevant to excusable neglect and remanded to this Court to "revisit" them; and (4) found that the administrative claims bar date in the confirmed plan cannot be enforced against the County because doing so would violate the County's due process rights. The District Court remanded the matter to this Court for additional proceedings consistent with its ruling.

E.    Whether the Proof of Claim Included any Livestock Taxes.

The District Court asked the Court to determine whether the County's proof of claim included any livestock taxes. The Court finds that it does not.  The following table summarizes the proof of claim attachments:

| Parcel | Tax amount | Property description |
|---|---|---|
| 3021118120320 | $5.00 | Agricultural land |
| 3017117136001 | $5.00 | Agricultural land |
| 3018117199068 | $5.00 | Agricultural land |

---

[17] When asked at the remand hearing whether she had argued due process on appeal, the County's counsel admitted that she hadn't, and described the Magistrate Court's ruling on the issue as a "good catch."

| | | |
|---|---|---|
| 3020116459460 | $5.00 | Agricultural land |
| 3021116340334 | $5.00 | Agricultural land |
| 3022114060264 | $5.00 | Agricultural land |
| 3024115133052 | $5.00 | Agricultural land |
| 3024115040280 | $217.95 | Residential mobile home improvement |
| 3024116072336 | $1,556.92 | Non-residential land |
| 3024118450200 | $2,021.12 | Residential improvement |
| 3024115362431 | $16,524.36 | Non-residential improvement; agricultural land |
| 3024115360180 | $31,454.06 | Non-residential improvement; agricultural land; residential improvement; residential land |
| 3024116286286 | $55,428.86 | Non-residential improvement; agricultural land |
| 3024115040280 | $127,577.76 | Non-residential improvement; agricultural land; residential land; residential improvement |
| Total: | $234,816.03 | |

The tax statements add up precisely to the claim amount. There is no way to squeeze $8,877.22 of 2016 livestock taxes into the claim. Similarly, there is no way to extract $8,877.22 of livestock taxes from any of the real property tax statements.

Barraza was questioned about one of the tax statements attached to the proof of claim. The tax statement has the same parcel number (3024115360180) as the 2018 tax bill for livestock taxes. It is clear, however, that the statement was for real property taxes, not livestock taxes. Among other evidence, the description of the taxed property in the statement is "nonresidential improvement;" "agricultural land;" residential improvement;" and "residential land." Furthermore, the stated amount, $31,454.06, matches a real property account in Barraza's first and third spreadsheets (account #R1201947),[18] which were emailed to Marcus. The parcel likely includes

---

[18] The redaction of the account number on this statement is imperfect, and the numbers "201" can be made out.

Debtor's dairy buildings and land. That would explain why it is taxed as real estate but is also associated in the County's tax records with Debtor's livestock.

The County has never shown how the filed proof of claim included $8,877.22 of 2016 livestock taxes. Barraza's spreadsheets tell the story, however. The spreadsheets reveal two things. First, they show the County's calculation of the livestock taxes due ($438,453.01). Second, they show Barraza's attempt to make the $8,877.22 of 2016 livestock taxes part of the proof of claim. The attempt fails. The only way Barraza could fit the 2016 livestock taxes into the proof of claim was to reduce claimed real estate taxes by a like amount. In the first and third iterations of the spreadsheet,[19] Barraza reduced real property taxes from a number of accounts and added $8,877.22 in livestock taxes. This is highly improper and bears no relation to the filed proof of claim. Based on the County's false assertion that its proof of claim included 2016 livestock taxes, Marcus paid the County $8,877.22 plus interest ($11,540.39 in total). The County had no right to receive this money from the liquidating trust.

It has always been within the County's power to demonstrate that the proof of claim included 2016 livestock taxes— simply put in evidence unredacted copies of the tax statements attached to the claim. If one of the statements is for account number P001767, that would decide the matter. The fact that the County has never taken this simple step is strong corroborative evidence that none of the attached statements is for livestock.

C.    Whether the County May File a Late Claim for 2016 and 2017 Livestock Taxes Based on Excusable Neglect.

1.    The excusable neglect standard. Whether the County may file a claim for the 2016 and 2017 livestock taxes out of time is governed by Bankruptcy Rule 9006(b)(1), which provides,

---

[19] The middle spreadsheet, which shows $147,012.03 of livestock taxes in the proof of claim, bears no resemblance to reality.

in relevant part, "when an act is required or allowed to be done at or within a specified period . . . the court for cause shown may at any time . . . permit the act to be done where the failure to act was the result of excusable neglect." In *Pioneer*, the Supreme Court articulated a flexible understanding of "excusable neglect" that allows the courts, where appropriate, to "accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." 507 U.S. at 389. The Supreme Court held:

> [T]his flexible understanding of "excusable neglect" accords with the policies underlying Chapter 11 and the bankruptcy rules. The "excusable neglect" standard of Rule 9006(b)(1) governs late filings of proofs of claim in Chapter 11 cases but not in Chapter 7 cases. The rules' differentiation between Chapter 7 and Chapter 11 filings corresponds with the differing policies of the two chapters. Whereas the aim of a Chapter 7 liquidation is the prompt closure and distribution of the debtor's estate, Chapter 11 provides for reorganization with the aim of rehabilitating the debtor and avoiding forfeitures by creditors. See *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S. Ct. 2309, 2312–2313, 76 L. Ed. 2d 515 (1983). In overseeing this latter process, the bankruptcy courts are necessarily entrusted with broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of ensuring the success of the reorganization. See *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 527–528, 104 S. Ct. 1188, 1197, 79 L. Ed. 2d 482 (1984). This context suggests that Rule 9006's allowance for late filings due to "excusable neglect" entails a correspondingly equitable inquiry.

*Id.* at 389 (footnotes omitted). Elsewhere the Supreme Court held that the inquiry is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* at 395. The Supreme Court weighed four factors to determine when neglect is excusable:

> (1) The danger of prejudice to the non-moving party;
> (2) The length of delay and its potential impact on judicial proceedings;
> (3) The reason for delay, including whether it was within the reasonable control of the movant; and
> (4) Whether the movant acted in good faith.

*Id.* (with alterations). In the Tenth Circuit, "fault in the delay remains a very important factor-perhaps the most important single factor-in determining whether neglect is excusable." *City of Chanute, Kan. v. Williams Natural Gas Co.*, 31 F.3d 1041, 1046 (10th Cir. 1994). "'[I]nadvertence,

ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable neglect.'" *United States v. Torres*, 372 F.3d 1159, 1163 (10th Cir. 2004) (quoting *Pioneer*, 507 U.S. at 392).

"Nevertheless, courts have affirmed findings of excusable neglect even where the movant was responsible for the delay." *Miller v. Power*, 2023 WL 6976602, at *1 (D. Utah) (citing *Pioneer* and *United States v. Vogl*, 374 F.3d 976, 981 (10th Cir. 2004)). "A court may take into account whether the mistake was a single unintentional incident (as opposed to a pattern of deliberate dilatoriness and delay), and whether the attorney attempted to correct his action promptly after discovering the mistake. '[A] mistake ... could occur in any [attorney's] office, no matter how well run.'" *Jennings v. Rivers*, 394 F.3d 850, 857 (10th Cir. 2005) (quoting *Hancock v. City of Okla. City,* 857 F.2d 1394, 1396 (10th Cir.1988)). A short delay that causes no prejudice is a good candidate for an excusable neglect finding. *See, e.g., In re Stefensen*, 511 B.R. 149, 156 (Bankr. D. Utah 2014) (excusable neglect found where a one-day delay in filing caused no harmful effects); and *In re Bread & Butter Concepts, LLC*, 2020 WL 6821861, at *1 (Bankr. D. Kan.) (excusable neglect found where proofs of claim were filed 11 days late because they were mailed to Debtor's counsel, not the bankruptcy court clerk's office).

"Prejudice from a late-filed claim is greater when the creditor's delay extends into the period in which the plan of reorganization is being 'negotiated, drafted, filed or confirmed.'" *In re Nat'l Steel Corp.*, 316 B.R. 510, 519 (Bankr. N.D. Ill. 2004) (quoting *In re Kmart*, 315 B.R. 718, 722 (Bankr. N.D. Ill. 2004); *see also In re ASARCO, LLC*, 2008 WL 4533733, at *2 (Bankr. S.D. Tex.) (citing *Nat'l Steel* and holding that allowing the untimely claim would prejudice creditors who have relied upon the claims register in negotiating a settlement with the debtor); *In re Graham Bros. Const., Inc.*, 451 B.R. 646, 652-53 (Bankr. S.D. Ga. 2011) (citing and following *Nat'l Steel*

and *ASARCO*); *In re Victory Memorial Hosp.*, 435 B.R. 1, 6 (Bankr. E.D.N.Y. 2010) ("Courts will also consider whether the plan of reorganization has already been filed or confirmed."); *In re Petroleum Prod. Mgmt., Inc.*, 240 B.R. 407, 416 (Bankr. D. Kan. 1999) ("[a]llowing [late creditor's] claim at this point would adversely impact the unsecured creditors who had filed timely claims and relied on receiving 55% on those claims after a difficulty [sic] negotiated settlement.").

"The burden of proving excusable neglect lies with the late-claimant." *In re Enron Corp.*, 419 F.3d 115, 121 (2d Cir. 2005); *see also In re Kmart*, 381 F.3d 709, 714 (7th Cir. 2004) (same); *In re Edwards Theatres Circuit Inc.*, 70 Fed. App'x 950, 951 (9th Cir. 2003) (unpublished) (same); *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000) (same).

Allegations are not proof. *See, e.g., Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1224 (9th Cir. 2000) (failure to present evidence in support of *Pioneer's* four factors is sufficient reason to deny the requested relief); *Carter v. Veteran's Admin. Long Beach*, 2020 WL 2303091, at *2 (C.D. Cal.) (citing and following *Bateman*); *In re Gambill*, 477 B.R. 753, 763 (Bankr. E.D. Ark. 2012) (lack of evidence means that a finding of excusable neglect cannot be made).

Finally, as is pointed out in *Pioneer*, there is no excusable neglect exception for chapter 7 bar dates. 507 U.S. at 389. Here, with a liquidating plan and the appointment of a liquidating trustee, the interests of the bankruptcy estate and creditors are similar to those interests in a chapter 7 case. The Debtor is being liquidated, not rehabilitated. Prompt closure and distribution of the Debtor's estate is the goal. The liquidating trustee is not nearly as familiar as the Debtor with the Debtor's tax obligations. Instead, the trustee must operate from the filed claims. Although the excusable neglect exception is available in liquidating chapter 11s, the policy reasons outlined in *Pioneer* suggest that excusable neglect should be applied more narrowly in liquidating than in reorganizing chapter 11 cases.

2.    <u>The six provided reasons to be revisited on remand</u>. The District Court directed the

Court to "revisit" six reasons the County "provided" in support of an excusable neglect finding.[20]

> <u>Provided reason #1: "The County had no record of receiving either Debtor's and Unsecured Creditors Committee's Joint Plan or the Confirmation Order</u>."

This allegation is in the County's initial response to Marcus' claim objection. The County

provided no factual support for it. As noted above, factual support is required for a finding of

excusable neglect. In addition, the plan referred to was not confirmed and was later withdrawn. It

is not the Plan.

Furthermore, by the time of the August 2020 hearing, this allegation had been superseded

by the following Stipulated Fact:

> DAC Treasurer hereby confirms receipt of the chapter 11 plan [doc. 376], disclosure statement [doc. 377], and the notice of deadline to object together in a single mailing in May 2018; however, a review of the DAC Treasurer's file did not find any record of the confirmation order [doc.440] although it was retrieved electronically from the Court register in late 2019 after the Liquidating Trustee filed his Partial Objection to Claim [doc. 566] that gave rise to this phase of the proceedings.

Motion to Amend and Application to Pay, section IX.

Finally, neither provided reason #1 nor the Stipulated Fact quoted above is relevant to

excusable neglect. Service of the Plan and confirmation order may be relevant to a due process

defense to the administrative claims bar date, but not to whether the County's failure to include

prepetition livestock taxes in its proof of claim was due to excusable neglect. In the Stipulated

Facts, the County admits receiving notice of the bankruptcy filing on September 19, 2017, as well

as the notice of claims bar date on or about November 15, 2017. Those are the "notice" facts

relevant to excusable neglect. Service of the confirmation order has no bearing whatever.

---

[20] District Court Opinion, pp. 24-25.

The Court properly disregarded the superseded, unsupported allegation that is "provided reason" #1.

<blockquote>Provided reason #2: "The chapter 11 Plan addressed priority tax claims in one boilerplate paragraph."</blockquote>

This "reason" is taken from the County's initial response to Marcus' claim objection. It too is an unsupported allegation. Further, the County did not use the term "boilerplate." Instead, the County alleged:

> The Liquidating Trustee's plan of reorganization was not submitted until another eight months after the filing of the DAC Treasurer's proof of claim and its plan for treatment of priority tax claims was addressed in one short routine paragraph of a twenty-two page document.

Third, the allegation is not an accurate description of the Plan language. "Priority Claim" is defined on p. 10 of the Plan. "Priority Tax Claim" is defined on p. 11 of the Plan. Article II, paragraphs 3.5, 3.6, and 4.1 set out the treatment of priority tax claims, stating that they will be paid in full within 30 days of the effective date of the Plan. The proposed treatment is not short or routine, nor is it boilerplate. It is easy to find, read, and understand.

Fourth, the Plan treated the County's prepetition claim as a separately classified claim, not a priority tax claim. The Plan stated that the County held a secured claim (secured by real property), and would be paid in full, with interest, when the real property was sold.

Fifth, the proposed treatment of priority tax claims is very favorable—paid in full within 30 days of the effective date. In a bankruptcy case, immediate payment in full is as good as it gets.

Sixth, the "provided reason" did not make it into the Stipulated Facts, perhaps because, by the time the County attorney prepared them, he had discovered that no one at the County had bothered to read the Plan.

Finally, the unsupported allegation is not relevant to the excusable neglect question. It is a non sequitur. To the question why the County failed to include prepetition livestock taxes in its proof of claim, the Plan's treatment of priority tax claims sheds no light. By the time the Plan was filed, the County's bar date had run.

The Court properly disregarded the unsupported and irrelevant allegation.

> Provided reason #3: "Due to staff turnover following an election, a layperson prepared the County's proof of claim."

This is not an accurate summary of the County's unsupported allegation, which is:

[T]he Treasurer's office underwent a turnover of senior staff on January 1, 2017 as a result of the defeat of the incumbent who ran for reelection in November 2016, only a year leading up to the deadline for filing an administrative objection. The completion and submission of the subject proof of claim form was done by a layperson in the Treasurer's office without the assistance of an attorney experienced in bankruptcy procedures.

The allegation does not say that the post-election turnover is what caused a "layperson" to draft the proof of claim. As the County later admitted, it did not, nor did the "turnover of senior staff" have anything to do with the fact that Barraza prepared the claim without the help of an attorney. Furthermore, what is a deadline for filing "an administrative objection" and what does it have to do with filing a proof of claim?

Likely due to the untrue and misleading nature of the allegation, the County discarded it when agreeing to the Stipulated Facts. The Stipulated Facts give some information about the County's preparation of the proof of claim, but do not state or imply that staff turnover had any effect on the process, nor that Barraza prepared the proof of claim because of the election or staff turnover.

The Court properly disregarded the unsupported and superseded provided reason #3 when weighing the excusable neglect factors.

> Provided reason #4: "The proof of claim only included taxes, interest, and fees through 2016 because Debtor's 2017 personal property taxes had not yet accrued when the County filed the Proof of Claim."

Like reason #3, this provided reason is not an accurate statement of the County's legal argument. The actual argument is:

> Since the tax liability of the Debtor for 2017 had not been determined at the time the petition was filed in this matter, the $234,816.03 shown on the POC represented only taxes accruing up through 2016 and any interest and penalties that had accrued thereon up until the date of petition.

The County argued that the 2017 taxes had not been "determined" on the petition date, not that the 2017 personal property taxes had not "accrued."

In any event, the allegation/argument was not included in the Stipulated Facts.

Finally, the assertion is plainly wrong. The proof of claim includes 2017 real property taxes. For reasons the Court can only guess, the County has taken the position that the proof of claim does not include 2017 taxes. This assertion underpins the County's argument, made for the first time on appeal, that it did not include livestock taxes because it "believed" that the 2017 taxes were postpetition taxes. The County's proof of claim belies the argument: it includes $150,793.80 of 2017 real property taxes. The Court properly disregarded this argument.

> Provided reason #5: "The County believed the 2017 Livestock taxes were a post-petition administrative expense for which it did not need to make a claim pursuant to 11 U.S.C. § 503(b)(1)(D)."

This "provided reason" is nowhere to be found in the County's amended response, or anywhere else. The County never alleged that it "believed," when it prepared the proof of claim, that the 2017 taxes were postpetition taxes. As discussed above, it could not have held such a belief, as it included 2017 real property taxes in the proof of claim.

Furthermore, as discussed below, the remand record makes clear that the County never believed the 2017 taxes were postpetition. Barraza knew the taxes should have been included in

the proof of claim. That's why she included the 2017 real property taxes. The fact that the proof of claim includes 2016 and 2017 real property taxes and omits 2016 and 2017 livestock taxes demonstrates that the problem had nothing to do with the tax year and everything to do with the County forgetting to include livestock taxes in the proof of claim.

Because there was neither evidence nor an allegation in the record about such a belief, the Court did not consider it.

> Provided reason #6: "The proof of claim had included the most up-to-date information available at the time of filing."

Unlike the other "provided reasons," this *is* in the Stipulated Facts. Barraza's affidavit, paragraph 5, states: "The information used in the preparation of the proof of claim was the most current and up to date information that existed at the time the claim was prepared." Thus, while the "provided reason" adds nothing new, at least it was in evidence at the August 2020 hearing.

The fact gives little support for an excusable neglect finding, however. It does not say that there was no "up-to-date" information about the livestock 2017 taxes. There was. The Stipulated Facts show that the County had final information about 2017 livestock taxes on November 1, 2017, months before the bar date. Furthermore, by October 2, 2017 (three days before Rodriguez signed the proof of claim), the County knew who was going to be taxed on the livestock (Barraza affidavit ¶1); had fixed tax rates (¶ 2-3); and had a property tax schedule (¶ 6-7). This was enough information to file a claim for 2017 livestock taxes, just like the 2017 real property taxes.

It was Barraza's choice to file the County's proof of claim five months before the bar date and two weeks before the final 2017 tax bills had been issued. It also was Barraza's choice not to check her work after she got notice of the bar date and the 2017 tax bills had been finalized.

In sum, only one of the "provided reasons" (#6) had factual support. It adds nothing to the Stipulated Facts. The other "provided reasons" were unsupported allegations or legal arguments.

Moreover, the "provided reasons" about whether the 2017 taxes had accrued; were pre- or post-petition; or were "believed" by the County to be postpetition, are misrepresentations of the trial record.

3.    Weighing the *Pioneer* factors using only the Stipulated Facts and the "provided reasons." It appears to the Court that the District Court intended to limit the Court's inquiry on remand to revisiting the "provided reasons" and, if they provide additional factual support for an excusable neglect finding, to weigh them and the Stipulated Facts as directed by *Pioneer*. The Court therefore weighs the *Pioneer* factors, using that limited record, as follows:

a.    The danger of prejudice to the nonmoving parties. The Stipulated Facts include Marcus' assertion that had the County timely filed its claims for the livestock taxes, the amount available to distribute to creditors would have increased by $468,153.32. The Court finds this credible. Marcus further asserted that, because the County did not timely file claims, the dividend to general unsecured creditors could be reduced by half or possibly more if the County's claims are allowed now. Thus, the only evidence in the record in August 2020 was that allowing the County to file a (very) late priority claim for prepetition livestock taxes would substantially prejudice general unsecured creditors.

The Stipulated Facts do not include any evidence that Marcus was on notice that the County sought payment for livestock taxes. The County's proof of claim did not give Marcus any notice because it does not include livestock taxes.

b.    The length of the delay and the potential impact on judicial proceedings. The bar date for the County to file a proof of claim was March 14, 2018. The County first made its "excusable neglect" argument on December 23, 2019, a year and eight months later. As briefing

went on, the "excusable neglect" argument faded from view. The County abandoned the argument in June 2020 when it filed its Motion to Amend and Application to Pay.

In the meantime, Marcus sold the cattle in 2018 and the real estate in March 2019. There was one other claim objection, which was resolved in October 2021. The only remaining adversary proceeding or contested matter on the docket is the County's Motion to Amend and Application to Pay. Further appeals cannot be ruled out. The Court finds that the delay has been very substantial and has had a significant adverse impact on the case. *See, e.g., In re K Mart*, 381 F.3d 709, 713 (7th Cir. 2004) (affirming the bankruptcy court's overruling a creditor's "excusable neglect" argument where the creditor's claim was filed one day late and the excusable neglect motion was filed 81 days after the bar date).

        c.      <u>The reason for the delay and whether it was within the reasonable control of the County</u>. Under the Stipulated Facts and provided reasons, the only reason given for the delay that had any factual support is that the "information used in the preparation of the proof of claim was the most current and up to date information that existed at the time the claim was prepared." This statement is incomplete and misleading. As discussed above, when Barraza prepared the proof of claim she had enough information about the 2016 and 2017 livestock taxes to include them in the claim, as shown by the fact that the 2016 and 2017 real estate taxes *were* included in the proof of claim. In addition, by November 1, 2017, the County had final tax bills for 2017 livestock taxes. Barraza chose to prepare the County's proof of claim five months early. There was no reason to do so, good reasons not to do so, and excellent reasons to update the claim after November 1, 2017.

The alleged reason the County relied upon heavily on appeal, i.e., that it believed when it prepared the proof of claim that the 2017 taxes were a postpetition obligation, is not in the record and is contrary to the fact that the proof of claim includes 2017 real property taxes.

The Court finds that the failure to include the 2016 and 2017 livestock taxes, and therefore the reason for the long delay in filing a proof of claim, was negligence and was well within the reasonable control of the County.

      d.     <u>Whether the County acted in good faith</u>. The Stipulated Facts and provided reasons give some support for a good faith finding. Based on that limited record, the Court finds that the County acted in good faith when it failed to include livestock taxes in its proof of claim. The Court is concerned, however, about the County's misrepresentations about the alleged record support for "provided reasons" #4 and #5.

      e.     <u>Weighing the factors</u>. Limiting the record to the Stipulated Facts and the provided reasons, clearly the County did not carry its burden of proving excusable neglect. Rather, the evidence shows that allowing the County to file a late priority claim for livestock taxes would substantially prejudice general unsecured creditors; that the late filing has substantially delayed the proceeding; that the reason for the delay was within the County's control and was its fault. Only good faith weighs in the County's favor, counterbalances by the misrepresentations about the trial record mentioned above.

The County did not carry its burden in part because it did not try to. By the time the County agreed to the Stipulated Facts and argued its case in August 2020, it had abandoned the excusable neglect argument. Otherwise, it would have argued excusable neglect at the hearing and given the Court the best evidence it could muster to support an excusable neglect finding. Instead, the Court got the Stipulated Facts and no excusable neglect argument at the hearing. The "provided reasons" added nothing because they are unsupported, are legal argument, are misrepresentations, or repeat a Stipulated Fact.

    4.     <u>Weighing the *Pioneer* factors using the complete remand record.</u>

Alternatively, if the District Court intended this Court to reopen the record on the excusable neglect issue, the Court weighs the *Pioneer* factors as follows, using the Stipulated Facts and the facts found in Section A and elsewhere in this opinion:

a.     The danger of prejudice to the nonmoving parties. Marcus negotiated the amount of the unsecured creditors' claims pool based on the filed prepetition and administrative expense claims. He did not take into account the County's unfiled livestock tax claims because the bar dates had long passed. Had the County timely filed claims for the livestock taxes, an additional $468,153.32 would now be in the unsecured creditors' pool. Marcus negotiated his settlement with Met Life based on claims filed. Although he was aware the County had asserted in a March 2019 email that there were unpaid livestock taxes, Marcus discounted the assertion because no claim had been filed. The prepetition bar date had passed more than a year before. Marcus had no reason to think that the Court would allow an unfiled priority claim at that late date. Marcus is an experienced, "no nonsense" bankruptcy lawyer. Had the County wished Marcus to take its late claim seriously, it should have gotten a County attorney to work on a motion for leave to file a late claim for the livestock taxes. An email from a County employee, without follow-up, understandably did not make an impression on Marcus. The County's proof of claim did not put Marcus on notice of any unpaid livestock taxes.

b.     The length of the delay and the potential impact on judicial proceedings. The County waited about a year and a half after filing its proof of claim before telling Marcus, by email, about its unfiled livestock tax claims. Even then, the County did not file a motion for leave to file a late claim. Likewise, Marcus' November 2019 objection to the County's proof of claim did not prompt the County into action, although the County asked the Court to consider its response a Bankruptcy Rule 9006(b)(1) motion. It was not until June 2020, when the Court set a deadline

for the County to take affirmative action, that the County filed the Motion to Amend and Application to Pay, which abandoned the excusable neglect argument. It is again before the Court, five and a half years after the bar date.

The fight over the County's late claim has substantially delayed the final distribution to creditors from the liquidating trust. This dispute is the only issue holding up the distribution. It has delayed the distribution by several years, during which time inflation has significantly devalued the funds Marcus has collected.

c. <u>The reason for the delay and whether it was within the reasonable control of the County</u>. The County was aware of Debtor's bankruptcy from the beginning. It was listed as a creditor in Debtor's schedules. It filed a proof of claim about a month after the petition date. Through neglect, and contrary to its own internal policies, County did not include 2016 or 2017 livestock taxes in the proof of claim. It did not realize its mistake for more than a year and a half and did not ask for relief for more than two years. In the interim, the County's attitude toward the bankruptcy case can only be described as cavalier. It did not read any of the documents in the case other than the initial bankruptcy filing notice and the bar date notice, nor did it take any action to protect its interests other than filing a deficient proof of claim. The County did not assign one of its attorneys to the case.

The County could have filed a claim by the bar date that included the 2016 and 2017 livestock taxes. It is clear from Barraza's professed duties as Cash Operations Supervisor that she knew to do that and how to do it. The fact that the proof of claim includes 2017 real property taxes is also telling, and perhaps dispositive. For reasons she does not know, Barraza failed to include livestock taxes.

Filing a timely and accurate claim was always within the County's control. Had Barraza or Rodriguez remembered to check on the livestock taxes, they could have followed their procedures and filed a complete claim.

d. **Whether the County acted in good faith**. The Court finds that the County acted in good faith when it prepared its deficient proof of claim. It tried to file a complete proof of claim but failed to do so. The County's actions thereafter, however, do not reflect as well on it. First, throughout the case the County was very lackadaisical about protecting its interests. Its good faith did not extend to due or other diligence.

Furthermore, the County's favored position seems to have instilled an attitude that it must get paid no matter what. Miss the bar date by two years? Neglect to read the Plan and Disclosure Statement? Neglect to check your work? Fail to get the lawyers involved in a big, complicated bankruptcy case? So what? The County must still be paid ahead of other creditors!

Third, as discussed above, the spreadsheets Barraza prepared and sent to Marcus misrepresent the taxes claimed in the proof of claim, in an apparent attempt to collect the 2016 livestock taxes. The attempt is improper.

Finally, the County's misrepresentations of the record when arguing why it did not include livestock taxes in its proof of claim are not consistent with good faith.

e. **Weighing the factors**. Considering the complete remand record, including the Stipulated Facts, the *Pioneer* factors weigh against allowing the County to file a late claim for prepetition livestock taxes. The County's proof of claim did not put Marcus on notice about the livestock taxes. Had the County acted timely, as it could have, unsecured creditors would not have been harmed because the unsecured claims pool would have been increased by the amount of the

County's claim.[21] As it is, that money is not available for unsecured creditors. In addition, a final distribution to creditors would have occurred years ago. The reason for the delay, an important factor in the Tenth Circuit, does not weigh in the County's favor. The County had all the information and knowledge needed to file a complete proof of claim. A combination of negligence and complacency doomed the County's efforts. The only factor to weigh in the County's favor may be good faith, but that factor is substantially weakened, perhaps even outweighed, by the post-filing actions described above.

D.    Whether There is Any Basis Other Than the Administrative Claims Bar Date on Which to Reject the County's Administrative Expense Claim for 2018 Personal Property Taxes.

The Court has been instructed on remand "to consider whether there is any basis other than the Administrative Claims Bar Date on which to reject [the County's administrative expense claim]; if there is no other basis, the claim should be allowed."

1.    No Other Basis. At the final hearing on remand, Marcus argued that there was an alternative basis for disallowing the County's administrative expense claim. He termed that alternative basis "finality." The Court does not find this argument persuasive. Finality—in the sense of case completion—is a laudable goal but is not recognized as a defense to a late administrative tax claim. Rather, in bankruptcy cases "finality" is achieved through bar dates, statutes of limitation, and deadlines in the Bankruptcy Code and Rules. On occasion, the equitable doctrine of laches is invoked. *See, e.g., In re Santos*, 589 B.R. 413, 421 (Bankr. D. Colo. 2018). So, while the Court agrees with Marcus that finality is very important in liquidating bankruptcy cases, it is not a substitute for one of the established mechanisms designed to move a case to final

---

[21] Vigorous action in January 2019, or even perhaps as late as March 2019, would have tipped the scales toward no prejudice. Had a County attorney filed a motion for leave to file a late claim for livestock taxes at that time, the dispute would have been "live" when Marcus was negotiating with Met Life. That was the County's last, best chance to avoid prejudicing the estate with its inaction.

distribution and closure, nor is it a separate and sufficient legal reason to disallow the County's late administrative expense claim.[22]

Based on the record below and on the new evidence and testimony obtained at the final evidentiary hearing on this matter, the Court finds no basis to disallow the County's administrative expense claim for livestock taxes other than the administrative expense bar date. Consequently, the claim will be allowed, subject to Marcus' right to review and object to the amount of the claim.

2.    <u>The County Never Made a Due Process Argument</u>. Both the Magistrate Court and the District Court found that enforcing the administrative claims bar date against the County would violate the County's due process rights. That may be; certainly, the failure to serve the County with the confirmation order and notice of confirmation are problems that implicate due process, as does the conflict between the Plan's administrative claim bar date language and § 503(b)(1)(D).

However, the County never made a due process argument to the Court. No due process defense was ever asserted in response to Marcus' administrative claims bar date argument. No Fed. R. Civ. P. 60(b)(4)[23] motion was ever filed seeking relief from the confirmation order. The County never complained that disallowing its administrative expense claim would violate its due process rights. On the contrary, the County argued that the Plan "clearly and unambiguously" required that the 2018 livestock taxes be paid. The County distanced itself from the due process argument in *Espinosa* by asserting that, in this case, the Plan and related documents clearly require Marcus to pay the County's administrative expense claim.

---

[22] It is possible Marcus was attempting to assert a laches defense. Because that term was never used, however, the Court will not consider the defense, which that was never argued as such.

[23] As applicable under Bankruptcy Rule 9024.  Under Bankruptcy Rule 9024, the County was required to file a complaint to revoke the order confirming the plan no later than 180 days after entry of the confirmation order under § 1144, i.e., on or before December 11, 2018.

Due process arguments are waived if not first presented to the trial court. *See, e.g., Carillo v. Qwest*:

> Mr. Carrillo also asserts for the first time on appeal that he was denied due process of law, but he fails "to articulate a reason for us to depart from the general rule that a federal appellate court does not consider an issue not passed upon below." *Walker v. Mather (In re Walker),* 959 F.2d 894, 896 (10th Cir. 1992) (quotation omitted). We therefore decline to consider his due process argument. *See id.*

113 Fed. App'x 848, 849 (10th Cir. 2004); *see also Smith v. Ray*, 189 Fed. App'x 807, 809 (10th Cir. 2006) (unpublished) (same); *Pratarelli v. Okla. State Univ. Bd. of Regents*, 25 Fed. App'x 812, 813 n.1 (10th Cir. 2002) (unpublished) (same); *Luna-Barrera v. I.N.S.*, 24 Fed. App'x 829, 830 (9th Cir. 2001) (unpublished) (same); *Rodriguez v. Laflore*, 230 Fed. App'x 351 (5th Cir. 2007) (unpublished) (same); *Haddad v. River Forest Police Dept.*, 384 Fed. App'x 513 (7th Cir. 2010) (unpublished) (same); *Bennett v. Goord*, 2008 WL 5083122, at *2 (2d Cir.) (unpublished) (same); *Sutton v. U.S.*, 1998 WL 964247, at *2 (6th Cir.) (unpublished) (same). As explained in *Singleton v. Wulff*, 428 U.S. 106 (1976):

> It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below. In *Hormel v. Helvering*, 312 U.S. 552, 556, 61 S. Ct. 719, 721, 83 L. Ed. 1037 (1941), the Court explained that this is "essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues . . . (and) in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." We have no idea what evidence, if any, petitioner would, or could, offer in defense of this statute, but this is only because petitioner has had no opportunity to proffer such evidence. Moreover, even assuming that there is no such evidence, petitioner should have the opportunity to present whatever legal arguments he may have in defense of the statute. We think he was justified in not presenting those arguments to the Court of Appeals, and in assuming, rather, that he would at least be allowed to answer the complaint, should the Court of Appeals reinstate it.

428 U.S. at 120. In *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716 (10th Cir. 1993), the Tenth Circuit held:

> In the years since, we have further fleshed out other reasons underlying this rule. Thus, we have noted that review of issues not raised below "would ... require us to

frequently remand for additional evidence gathering and findings," *Hicks v. Gates Rubber Co.,* 928 F.2d 966, 970–71 (10th Cir. 1991); would undermine the "need for finality in litigation and conservation of judicial resources," *id.* at 971; would often "have this court hold everything accomplished below for naught," *Bradford v. United States,* 651 F.2d 700, 704 (10th Cir. 1981); and would often allow "[a] party ... to raise [a] new issue on appeal [when that party] invited the alleged error below." *Id.*

However, this rule is not without exceptions. We have held that it does not apply to "cases where the jurisdiction of a court to hear a case is questioned, [or] sovereign immunity is raised." *Hicks,* 928 F.2d at 970. More generally, the Supreme Court has stated:

> The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt ... or where "injustice might otherwise result."

Singleton, 428 U.S. at 121, 96 S. Ct. at 2877 (citations omitted) (quoting *Hormel,* 312 U.S. at 557, 61 S. Ct. at 721).

Consequently, we have exercised our discretion to hear issues for the first time on appeal only in the most unusual circumstances.
. . .
In the main, however, we have consistently refused invitations to consider new issues on appeal. We have therefore repeatedly stated that a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory. *Lone Star Steel v. United Mine Workers,* 851 F.2d 1239, 1243 (10th Cir. 1988); *United States v. Lattauzio,* 748 F.2d 559, 561 (10th Cir. 1984). We have been particularly insistent on this rule in cases where the theory advanced on appeal was in direct contradiction to the theory pursued in the trial court. *See Dime Box Petroleum Corp. v. Louisiana Land and Exploration Co.,* 938 F.2d 1144, 1148 (10th Cir. 1991); *Bradford v. United States,* 651 F.2d 700, 704–05 (10th Cir. 1981).

994 F.2d at 721-22.

Another general rule of appellate practice and procedure is that courts of appeal do not

decide appeals on grounds they raise sua sponte:

> as a general rule, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Id*., at 386, 124 S. Ct. 786 (SCALIA, J., concurring in part and concurring in judgment). As cogently explained:

> "[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do, and this must be particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before us."
> *United States v. Samuels,* 808 F.2d 1298, 1301 (C.A.8 1987) (R. Arnold, J., concurring in denial of reh'g en banc).

*Greenlaw v. U.S.*, 554 U.S. 237, 244 (2008) (footnote omitted); *see also Modoc Lassen Indian Housing Authority v. U.S. Dept. of Housing and Urban Devel.*, 881 F.3d 1181, 1194 n.9 (10th Cir. 2017) (citing *Greenlaw*, the court declined to consider an argument not made to it on appeal). In *Bronson v. Swenson*, 500 F.3d 1099 (10th Cir. 2007), the Tenth Circuit held:

> An appellant's opening brief must identify "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(a). Consistent with this requirement, we routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief. . . . Stated differently, the omission of an issue in an opening brief generally forfeits appellate consideration of that issue. *See Wyoming v. Livingston,* 443 F.3d 1211, 1216 (10th Cir. 2006), *cert. denied,* 549 U.S. 1019, 127 S. Ct. 553, 166 L. Ed. 2d 409 (2006); *Anderson v. U.S. Dep't of Labor,* 422 F.3d 1155, 1174 (10th Cir. 2005).

500 F.3d at 1104; *see also Hunter v. Hirsig*, 660 Fed. App'x 711, 716 (10th Cir. 2016) (unpublished) (same, citing *Bronson*); *Medina v. Univ. of Utah*, 2023 WL 6890930, at *4 (10th Cir.) (unpublished) (same); *Goldsmith v. United States*, 2023 WL 5995458, at *2 (10th Cir.) (unpublished) ("Mr. Goldsmith also waived any challenge to the dismissal of the free-speech claim by failing to address it in his opening brief."); *Tyron v. Quick*, 81 F.4d 1110, 1151 n.22 (10th Cir. 2023) ("a passing reference to a matter is insufficient to present an issue for appellate review"); *Arostegui-Maldonado v. Garland*, 75 F.4th 1132, 1147-48 (10th Cir. 2023) ("'cursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary' to preserve an issue for appellate review") (quoting *Bronson*).

<u>Conclusion</u>

On the three matters remanded to the Court, the Court finds and concludes:

- The proof of claim does not include any livestock taxes;

- The "provided reasons" do not give additional support for an excusable neglect finding. Based on the Stipulated Facts and the "provided reasons," the County did not carry its burden of showing excusable neglect. Alternatively, when the full evidentiary record is considered with the Stipulated Facts, the County did not carry its burden to showing excusable neglect; and

- There is no basis for denying the County's administrative expense claim other than the administrative expense claim bar date in the Plan.

The Court will enter a separate order consistent with the foregoing.

Hon. David T. Thuma
United States Bankruptcy Court

Entered: December 1, 2023
Copies to: counsel of record